*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0323p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LAWRENCE REYNOLDS,

        *Petitioner-Appellant,*

    *v.*

No. 03-3822

MARGARET BAGLEY, Warden,

        *Respondent-Appellee.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 00-01239—David D. Dowd, Jr., Sr. District Judge.

Argued: April 4, 2007

Decided and Filed: August 16, 2007

Before: MARTIN, COLE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Pamela Prude-Smithers, Robert K. Lowe, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Pamela Prude-Smithers, Robert K. Lowe, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Kevin M. Cafferkey, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Petitioner Lawrence Reynolds was convicted and sentenced to death by an Ohio jury for the 1994 murder of Loretta Foster. After exhausting his state court appeals, both direct and collateral, he filed a petition for habeas corpus in federal district court. The district court denied Reynolds's petition, and we now **AFFIRM** the district court.

I

In the late afternoon or early evening of January 11, 1994, Lawrence Reynolds assaulted, robbed, and killed his neighbor, Loretta Foster, in her home. He took forty dollars in cash and a blank check from her purse, and left her almost-nude body lying on the living room floor. Later that same night, Reynolds told two friends much of what he had done. Uncertain whether to believe him, the two went to Foster's home, looked through the living-room window, and saw the body. They alerted the police, who arrested Reynolds early the next morning.

1

Reynolds's father consented to a search of his son's bedroom. (Reynolds was twenty-seven years old at the time of his acts, and continued to live at home.) The search revealed several items of physical evidence later used against Reynolds at trial: (1) gloves and a camouflage jumpsuit, both smeared with blood of the same type as Foster's and containing fibers matching those from a red jacket found in her bedroom; (2) a piece of rope identical to that used on Foster, stained with blood of her type and containing human hair matching her own; (3) a section of a tent pole, in keeping with what Reynolds had told his friends he brought to Foster's house; and (4) a blank check drawn on Foster's account. An autopsy concluded that Foster had died from strangulation. Based on the color of the bruises on her wrists, the coroner testified that Foster had been alive when tied up. The coroner was unable to find any physical evidence of sexual conduct.

While in jail, Reynolds told a fellow inmate essentially the same story as he had told his friends, but with more, at times conflicting, details. For example, Reynolds stated to the inmate that he had "tried to stick his meat in her," and yet when the inmate questioned Reynolds specifically on the matter, he denied trying to rape her.

An Ohio jury convicted Reynolds of aggravated robbery, aggravated burglary, kidnaping, and attempted rape, as well as aggravated murder (of the felony-murder type) with four death-penalty specifications attached. He was sentenced to 38-to-90 years' imprisonment and death. He unsuccessfully sought relief via direct appeal. *State v. Reynolds*, No. 16845, 1996 WL 385607 (Ohio Ct. App. July 10, 1996), *aff'd*, 687 N.E.2d 1358 (Ohio), *cert. denied*, 524 U.S. 930 (1998). He was also unsuccessful in obtaining state post-conviction relief and was denied an evidentiary hearing, which he sought in order to buttress his post-conviction claims. *State v. Reynolds*, No. 94-01-0158 (Summit County Ct. Com. Pl. Mar. 27 & Apr. 8, 1998), *aff'd*, No. 19062, 1999 WL 980568 (Ohio Ct. App. Oct. 27, 1999), *juris. denied*, 723 N.E.2d 1113 (Ohio 2000). Reynolds did not file a *Murnahan* motion, which is Ohio's vehicle for raising ineffective assistance of appellate counsel claims. *See State v. Murnahan*, 584 N.E.2d 1204, syllabus ¶ 2 (Ohio 1992).

On February 1, 2001, Reynolds filed a federal habeas corpus petition raising 19 claims. The petition was denied, and he now appeals this ruling, citing five issues for review. A certificate of appealability was granted on each of the five issues.

II

Reynolds's federal habeas petition was filed subsequent to the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA") in 1996, and thus its provisions govern this court's review. Under AEDPA, a federal court may not grant habeas relief unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "unreasonable application" prong of this section, the prong most relevant to the instant case, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." *Price v. Vincent*, 538 U.S. 634, 641 (2003). Rather, "[i]n order for a federal court to find a state court's application . . . 'unreasonable,' the state court's decision must have been more than incorrect or erroneous[;] [it] must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). As this court has stated, "a federal habeas court must ask whether the state court's application of clearly established federal law was objectively reasonable.

If the federal court finds that, viewed objectively, the state court has correctly identified the governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case, it may grant the writ." *Millender v. Adams*, 376 F.3d 520, 523 (6th Cir. 2004).

In considering a district court's decision to deny an evidentiary hearing, which we normally review for abuse of discretion, *see White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005), we must also keep the precepts of AEDPA deference in mind. *Schriro v. Landrigan*, 550 U.S. — , 127 S. Ct. 1933, 1940 (2007) ("Because the deferential standards prescribed by [28 U.S.C.] § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.").

## A. Denial of Evidentiary Hearing

Reynolds's principal argument on appeal is that he was improperly denied an evidentiary hearing, during both state and federal habeas proceedings, to adduce evidence in support of his ineffective assistance of trial counsel claim and his claim regarding deficiencies in the trial court's sentencing opinion. He relies primarily on two cases from outside this circuit in support: *Siripongs v. Calderone*, 35 F.3d 1308, 1310 (9th Cir. 1994) ("In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop the factual record on that claim, is entitled to an evidentiary hearing in federal court."); and *Buenoano v. Singletary*, 963 F.2d 1433, 1439 (11th Cir. 1992) ("A federal court must hold an evidentiary hearing if the [habeas] petitioner did not receive a full and fair hearing in the state courts."). The evidentiary hearing was required, Reynolds maintains, because "[i]n order for a reviewing court to determine whether trial counsel's decisions were a result of a reasoned strategic decision not to present expert testimony or other mitigating evidence to the jury, the court must review trial counsel's reasons for their failures," and "[t]he only way to obtain this information is through discovery or an evidentiary hearing." Appellant's Br. at 14.

A peculiar procedural twist seems at first blush to favor Reynolds. The trial judge who presided over both the guilt and penalty phases of Reynolds's trial, Judge Schneiderman, was also assigned to Reynolds's post-conviction proceedings. Judge Schneiderman scheduled an evidentiary hearing for March 30, 1998. In anticipation of the hearing, Reynolds issued almost twenty subpoenas to various individuals and entities, such as the Cuyohoga Falls Police Department, Cuyohoga Falls General Hospital, and even Judge Schneiderman himself (based on Reynolds's allegations of improprieties in the preparation of the judge's sentencing opinion). Joint App'x at 1060-1102. Judge Schneiderman became a potential witness by virtue of this subpoena, and thus he voluntarily recused himself from further proceedings and post-conviction matters were reassigned to a different judge, Judge Hayes. Judge Hayes denied the evidentiary hearing that had been granted by his predecessor, and subsequently dismissed Reynolds's petition for post-conviction relief. Judge Hayes's denial of the evidentiary hearing was based on his finding that Reynolds had been given "ample time," *id.* at 1119, to develop a factual basis for his ineffective assistance claims—be it in respect to how his alcoholism was handled at trial and mitigation, *id.* at 1118-1121, what further mitigating evidence generally might have been presented, *id.* at 1121-22, or what further neurological testing could have been conducted on Reynolds, *id.* at 1129-30—and yet had come up with precious little to justify a hearing. Reynolds now maintains that Judge Hayes's decision was in error because

> [p]ost-conviction counsel had conducted extensive investigation in preparation for
> the hearing and was prepared to present a number of witnesses and experts, including
> a psychologist and neuropsychologist, to factually develop Reynolds' claims. . . .
> Had an evidentiary hearing been granted testimony would have been presented of

serious incidents of abuse in the Reynolds' home and of Reynolds' father's serious alcohol problem.

Appellant's Br. at 15.

Judge Hayes's decision not to conduct an evidentiary hearing was reviewed by the Ohio Court of Appeals. *State v. Reynolds*, No. 19062, 1999 WL 980568 (Ohio Ct. App. Oct. 27, 1999) (unpublished). The appeals court noted that "[w]hen a new judge has been appointed after the recusal of the trial judge in a post-conviction petition, it is incumbent on the new judge to consider all motions *de novo*." *Id*. at *11 (citing *State v. Perdue*, 441 N.E.2d 827, 829 (Ohio Ct. App. 1981)). In other words, the appeals court held, the mere fact that Judge Schneiderman had originally scheduled an evidentiary hearing did not preclude Judge Hayes from making an independent determination that such a hearing was not ultimately required. As to the merits of Judge Hayes's decision, the appeals court held that under Ohio Rev. Code § 2953.21(C), a petitioner is only entitled to an evidentiary hearing if he can show, in the first instance, "substantive grounds for relief." *See State v. Jackson*, 413 N.E.2d 819, 822 (Ohio 1980) ("Before a hearing is granted, the petitioner bears the initial burden in a post-conviction proceeding to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel *and also* that the defense was prejudiced by counsel's ineffectiveness.") (emphasis added). Because Reynolds had made no threshold showing of these substantive grounds for relief nor had he come forward with any showing that his trial counsel's actions materially prejudiced the outcome of the case, the appeals court concluded that Judge Hayes did not err in denying his request for an evidentiary hearing.

We now hold that Reynolds is precluded from relief on his evidentiary hearing claim. First, as articulated by the Ohio Court of Appeals, under Ohio's collateral review procedures, specifically Ohio Rev. Code § 2953.21(C), Reynolds is not *guaranteed* an evidentiary hearing; rather, he is only entitled to one upon a showing that he has substantive grounds for relief. *Jackson*, 413 N.E.2d at 822; *see also State v. Kapper*, 448 N.E.2d 823, 826 (Ohio 1983). Reynolds puts the cart before the horse by arguing that evidence obtained from the people he intended to subpoena would have provided exactly such grounds for relief. The point is that he must make an *initial* evidentiary showing—through affidavits and the like—that he has grounds for relief. And here, the state judge determined that this initial showing was insufficient, especially in light of the fact that Reynolds had been given ample discovery time since the termination of his direct appeal to make the showing.

Reynolds's argument, at least with respect to the ineffective assistance claims, also fails for a second reason. Judge Hayes noted during state post-conviction proceedings that "[e]vidence outside the record . . . will not guarantee a hearing, if the petition does not allege facts to show that the issue could not have been brought on direct appeal." Joint App'x at 1116; *see also State v. Perry*, 226 N.E.2d 104, 109 (Ohio 1967) ("Our statutes do not contemplate relitigation of those claims in postconviction proceedings where there are no allegations to show that they could not have been fully adjudicated by the judgment of conviction and an appeal therefrom."). In this case, Reynolds was represented by different counsel from his trial counsel when he sought direct appeal. As such, he had the duty to bring the instant ineffective assistance claims at that juncture, *State v. Lentz*, 639 N.E.2d 784, 786 (Ohio 1994), and he fails to explain now why these claims were not already properly resolved, or why any new evidence he now hopes to use could not have been discovered at the time of his direct appeal. Reynolds could have argued that his state *appellate* counsel was ineffective for not adequately investigating/discovering evidence of his trial counsel's inadequate performance, but he is procedurally defaulted from making such a claim because he failed to file a *Murnahan* motion in state court, as noted in the procedural history above.

Finally, Reynolds's claim fails due to the strictures of AEDPA, as recently applied to the evidentiary hearing context in *Schriro*. While it is true that a district court, sitting in federal habeas, has the power independently to grant an evidentiary hearing, the federal court's decision owes

considerable deference to that of the state courts on the same issue. 127 S.Ct. at 1940. Here, it does not appear that Reynolds is asking for an evidentiary hearing to present evidence any different from what he hoped to present to Judge Hayes almost a decade ago. Since we do not find that Judge Hayes unreasonably denied the evidentiary hearing back then, it almost goes without saying that the district court did not abuse its discretion in denying effectively the same evidentiary hearing now. Even at the federal district court level, having had even more time to put on a case, Reynolds appears unable to have marshaled evidence to convince the district court that an evidentiary hearing would be necessary, or that the state courts' resolution of the matter had been unreasonable. He continues to assert that he needs the evidentiary hearing to factually *develop* his constitutional claims, but he has failed at every level to make a factual *showing* (as opposed to conclusory statements) as to why those claims merit development through the crucible of an official hearing.

At bottom, Reynolds is asking us to accept the generalized proposition that a defendant sentenced to death should *always* be entitled to an evidentiary hearing on post-conviction review: that is, if he is denied one at the state level, then he must be granted one at the federal level. Yet *Schriro* expressly refutes this proposition. *Id.* ("[A] district court is not required to hold an evidentiary hearing."). We might be inclined to agree with Reynolds if it were true that an evidentiary hearing were the *sine qua non* of evidence-gathering and evidence-presenting. But of course, there are other ways to present evidence, and as discussed above, an evidentiary hearing was decidedly not required for Reynolds to be able to make an initial factual showing of his counsel's deficiencies; instead, affidavits and other readily-obtainable forms of evidence would have sufficed.

We therefore affirm the district court's denial of Reynolds's request for an evidentiary hearing.

## B. Failure to Timely Dismiss Prospective Juror for Cause

In his second claim, Reynolds argues that statements made by Officer John Vanhyning, an Ohio police officer, unconstitutionally tainted the jury venire. Officer Vanhyning was himself on the jury venire. He revealed during voir dire that he knew several of the police officers involved in Reynolds's case, including at least one, Detective Gay, who would be testifying against Reynolds. When asked by the prosecutor whether he would be able to objectively evaluate Gay's testimony even though he knew Gay, Vanhyning did not directly answer the question, but rather said: "I have always found him to be completely truthful." Later, when the prosecutor asked Vanhyning if he thought it was problematic that he had worked with the prosecutor on previous occasions, Vanhyning stated that he could remain objective — but prior to doing so noted how "efficient" the prosecutor was, and how the prosecutor demanded a lot from police officers before "moving forward" with a prosecution. After hearing more about the relationship between Officer Vanhyning and some of the members of the prosecution, the trial court excused him from the jury venire, noting:

> Well, you know, Officer Vanhyning, I think I am going to take the bull by the horn. I am going to excuse you. And I hope I don't insult your integrity in any way, I don't mean to do that. But you are pretty close to it, not because you are close to this case, but you are close to law enforcement, and it has been your whole life.

Joint App'x at 1667.

Reynolds now claims that this dismissal came too late. He argues that Vanhyning's statements, which were made in the presence of the entire jury venire, cast a sheen of credibility on the prosecutor by indicating how "efficient" he was and how "completely truthful" some of his testifying officers would be. Reynolds points out that his defense counsel had previously moved to

strike Vanhyning for cause, but the court had denied the motion, and then during the subsequent voir dire Vanhyning's pro-prosecution statements were heard by the entire jury venire. Reynolds's counsel did not, however, move to strike the entire venire based on those statements.

Reynolds's claim rests on a very tenuous theory, one which the district court labeled as a "sub silentio argument [] that the trial court has a sua sponte duty to discharge the entire jury panel, even in the absence of a defense motion to that effect." D. Ct. Op., 1/13/2003, at 20. We are inclined to agree. Although Vanhyning's statements could *theoretically* have biased ultimately-seated jurors in favor of the prosecution and its witnesses, Reynolds has failed to show that there was any *actual* bias, especially given the trial judge's subsequent curative instruction that jurors would have to decide the case for themselves. *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (noting that a trial judge's determination of actual bias "is essentially one of credibility, and therefore largely one of demeanor," and, as such, is entitled to special deference). Nor is this a case in which the jury venire appears to have been predisposed to convict Reynolds, so that Vanhyning's comments might have only heightened their predisposition, the trial judge's curative instructions notwithstanding. *Cf. Foley v. Parker*, 488 F.3d 377, 394-96 (6th Cir. 2007) (Martin, J., dissenting). Thus while we can conceive of a hypothetical in which a single veniremember's comments, prior to his dismissal, might irreparably prejudice the remaining veniremembers against the defendant, the instant case does not approach that hypothetical. Therefore we reject Reynolds's second claim.

### C./D. Ineffective Assistance of Trial Counsel for Failure to Obtain Proper Expert Assistance during Trial and Mitigation

Reynolds claims that he was unconstitutionally denied effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because his trial counsel failed to request: (1) "the assistance of an independent pharmacologist, toxicologist, or alcohol expert," (2) "the assistance of a forensic psychologist to properly investigate, obtain and prepare information to be presented to the jury," and (3) "the assistance of a competent neurological expert to examine Reynolds to determine if his thought processes were impaired as a result of multiple head injuries he suffered as a child or as a result of his long-term alcohol abuse." Appellant's Br. at 35.

Reynolds does not argue that his counsel failed entirely to retain and present experts. Prior to trial, for example, Dr. Levkowitz performed a neurological examination of Reynolds. The examination was cursory (lasting approximately 5 minutes), and no CAT scan was performed, but neither did it reveal any neurological problems. Joint App'x at 1019 (Pappas Aff.). And during the mitigation phase, Reynolds's counsel presented the testimony of Dr. Bendo, a psychologist. Dr. Bendo opined that the "primary problem" throughout Reynolds's life was likely a combination of his alcoholism and "antisocial personality," i.e., the fact that he was "pretty much alone in the world." *Id*. at 1882 (Bendo Test.). When asked whether Reynolds's conduct on the night of the murder was mitigated by his psychological condition, Dr. Bendo responded:

> I think it was mitigated by his psychological condition, certainly, in terms of use of poor judgment, some of the impulsivity that goes with that. . . . What's confusing is that this type of person doesn't commit this type of crime, it is a low probability. . . . They could commit crimes like DUI, or petty offenses or those kinds of things. I think Larry [Reynolds] shows some of that in his history. But it is not the kind of profile that is seen commonly in this particular kind of case.

*Id*. at 1880-81.

Reynolds's contention is that Levkowitz's examination was not thorough enough and Bendo's testimony was "deficient," both because he was relatively inexperienced as a mitigation expert and because he was a general psychologist, not a forensic psychologist. At bottom, Reynolds

is claiming that Levkowitz and Bendo were not the "best" experts. While this may or may not be true, it is not enough to clear the *Strickland* prejudice hurdle, let alone the *Strickland* performance hurdle. *See Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000) (noting that a habeas petitioner is not entitled to relief simply because the petitioner's expert "did not testify as favorably as the petitioner had hoped"); *accord Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006).

As to Reynolds's claims regarding an alcohol expert, the question is arguably closer because on this issue no expert was presented at all. To be sure, numerous references were made by trial counsel (and by witnesses) regarding Reynolds's chronic alcoholism and his state of drunkenness at the time of the murder. But Reynolds maintains that the jury was given only "generic" information about his alcoholism, and thus jurors were left to draw only from personal experience how alcohol might have affected Reynolds on the day of the murder. Appellant's Br. at 39. What was missing, claims Reynolds, was testimony to the effect that "alcohol dependence is universally accepted by the medical profession as being a *disease*." *Id*. at 38 (emphasis added). And because trial counsel conceded in his opening statement that Reynolds was guilty of the murder of Ms. Foster, Reynolds now maintains that the alcoholism defense was practically his only hope of mitigation during the guilt phase. As such, hindsight leads us to wonder whether trial counsel exercised sound judgment in relying exclusively on the presentation of lay testimony regarding Reynolds's alcoholism and its effect on his behavior. Wonder as we might, however, we cannot say that the Ohio state courts were *unreasonable* in viewing trial counsel's strategy not to present an alcohol expert—whether this was indeed "strategic" or not—as not prejudicial to the outcome of Reynolds's case. For example, as the Ohio Court of Appeals concluded:

> Reynolds claims that he was prejudiced by defense counsel's failure to request, and thus the trial court's failure to appoint, certain experts to assist in the presentation of Reynolds' alcoholism as a mitigating factor and a defense as to the requisite mens rea of the offenses charged. His claim is supported by the affidavit of Dr. James Eisenberg, a forensic psychologist, in which he stated, "a toxicologist, pharmacologist, and/or alcohol evaluation should have been suggested by [mitigation witness] Dr. Bendo."
>
> This Court has stated that, "a postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." *State v. White* (Jun. 16, 1999), Summit App. No. 19040, unreported, at 12, quoting *State v. Combs* (1994), 100 Ohio App. 3d 90, 103, 652 N.E.2d 205, judgment affirmed (1994), 69 Ohio St. 3d 1480, 634 N.E.2d 1027 and *certiorari denied* (1995), 513 U.S. 1167, 130 L. Ed. 2d 1097, 115 S. Ct. 1137. Furthermore, Reynolds offers no evidence that there is a reasonable probability that the addition of expert witnesses would have changed the outcome of the guilt or the sentencing phase of his trial. Thus he does not offer evidence of sufficient operative facts to demonstrate substantive grounds for relief.

1999 WL 980568, at *4.

We note also that this court has recently rejected a habeas petitioner's similar claim that his counsel was deficient for not having retained the "proper" expert to testify to his alcoholism and its causal connection to the murder he committed. *See Nields v. Bradshaw*, 482 F.3d 442, 455-57 (6th Cir. 2007) (suggesting that counsel's alleged failure to elicit "causal relationship" testimony from mitigation witnesses—i.e., testimony that the defendant's alcoholism necessarily caused his violent conduct—likely says less about counsel's inadequacy than about the fact that no such relationship actually existed). Ultimately, Reynolds's claim with regard to expert testimony fails for similar reasons to what we have discussed regarding his request for an evidentiary hearing. He has failed to convince us—or any other court, state or federal—through presentation of affidavits or other

evidence, that testimony from different experts, or new experts, would have in any way altered the outcome of his trial.

### E. Due Process Violations Flowing from the Sentencing Opinion

Reynolds's final claim of error is that his sentencing proceedings were fundamentally unfair for two reasons: first, because the trial court filed its sentencing opinion during the sentencing proceeding itself, suggesting that the judge's mind had been made up and his opinion a *fait accompli*, regardless of anything that might have transpired during the sentencing hearing; and second, because the trial court's opinion failed to properly state how the court had weighed aggravating and mitigating factors.

The penalty phase of Reynolds's trial ended on June 1, 1994, when the jury recommended that Reynolds be put to death. The sentencing hearing was held eight days later, early in the morning of June 9, 1994. At that hearing, the court sentenced Reynolds on the non-capital counts (after first allowing counsel for both parties to speak and offering Reynolds the opportunity to speak), then proceeded to address the sentence for the aggravated-murder conviction. The written death sentence appears to have been filed roughly midway through the hearing. Before pronouncing the sentence of death orally, however, the trial judge made this announcement: "This Court's written decision has been prepared. It is now being filed, and copies will soon be available to counsel." The trial judge then gave counsel for both parties an opportunity to argue what Reynolds's sentence should be. Next, and without giving Reynolds the opportunity to make a final statement, the trial judge orally sentenced Reynolds to death.

Reynolds appealed what he viewed as a gross procedural error on the part of the trial court. The Ohio Supreme Court agreed with him that the trial court had erred, but held that the error was harmless because, among other considerations: (a) the trial court had already heard all of the evidence, and (b) the arguments that defense counsel advanced at the hearing were substantially the same as those that counsel had already advanced during the penalty phase. 687 N.E.2d at 1372. The district court found that the timing of the filing of the sentencing opinion, "whether before or after the pronouncement of the sentence, does not give rise to the violation of a constitutional right." D. Ct. Op., 1/13/03, at 63. We conclude that the Ohio Supreme Court's resolution of this issue was a reasonable one, because Reynolds has been unable to make a showing that he presented any new arguments to the trial court *after* the court filed its written opinion. The trial court's actions were ill-advised, to be sure, but in the final analysis they did not deprive Reynolds of a constitutional right.

We also reject Reynolds's second argument, involving what he contends were the trial court's missteps in treating aggravating and mitigating factors in its opinion. The Ohio Supreme Court analyzed this claim on direct review:

> We conclude that the trial court's failure to unambiguously explain why the aggravating circumstances outweighed the mitigating factors is not prejudicial error.

> While the trial court discussed the facts surrounding the crime (a nonstatutory factor) in its opinion, it did not weigh those facts as aggravating circumstances. Instead the court reviewed the nature and circumstances of the crime, as it was required to do pursuant to R.C. 2929.03. We conclude that the trial court did not consider non-statutory factors.

> Reynolds argues that the trial court did not give "significant" weight to his alcoholism. The statute does not require that significant weight be accorded. The weight, if any, given to a mitigating factor is a matter for the discretion of the

individual decision-maker. We conclude that the trial court properly weighed the mitigating factor of alcoholism.

We note, *sua sponte*, that the trial court did not correctly weigh the aggravating circumstances and mitigating factors. The court weighed each aggravating circumstance separately against the mitigating factors instead of weighing all the aggravating circumstances against all the mitigating factors. The trial court stated in its opinion that "the state of Ohio has proved beyond a reasonable doubt that each aggravating circumstance for which he was found guilty outweighed all the mitigating factors." Although this issue was not raised by Reynolds, ***our independent review will cure the error***.

[. . . ]

This court is required by R.C. 2929.05 to independently review this case and conduct an appropriateness and proportionality evaluation as to the death sentence. We conclude that the evidence in the record supports a finding that Lawrence Reynolds, Jr. committed the aggravated murder of Loretta Foster while committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated robbery, and aggravated burglary. Moreover, the evidence establishes that Reynolds was the principal offender in the commission of the aggravated murder.

The nature and circumstances of the crime offer nothing in mitigation for Reynolds. His history, character, and background suggest some mitigating factors. Reynolds was raised in a middle class home by both parents. He began drinking alcohol in his early teens. After graduating from high school, he served in the Army for six years before being honorably discharged. Upon discharge, he moved in with his parents. He eventually found employment and moved into his own apartment. Throughout this time, the use of alcohol continually plagued his life.

As his alcohol usage increased, it affected his employment, leading to his termination from his job. In January 1992, he was arrested for driving under the influence and failing to comply with a police officer's signal or order. He moved back in with his parents and completed alcohol treatment as part of his probation, but soon began drinking again. He appears to have been employed, or earning some money, until about four months prior to the crimes. He then began to sell his personal belongings to support his drinking habit. By the time of the murder, he had become desperate because he had nothing more to sell.

Dr. Joseph Bendo, a psychologist, diagnosed Reynolds as having an adjustment disorder, which caused him to react more strongly than the stressors or the environment in his life might warrant. Dr. Bendo concluded that Reynolds had an antisocial personality type with addictive-proneness to alcohol and drugs. His drinking was a product of his inability to relate effectively with people. While this proclivity does not meet the mitigating factor standard of R.C. 2929.04(B)(3), we will consider it under R.C. 2929.04(B)(7).

In an unsworn statement, Reynolds expressed his remorse to the victim's family and to his own family and asked the jury to spare his life.

We weigh the aggravating circumstances against the following mitigating factors: lack of a substantial criminal record (R.C. 2929.04[B][5]), honorable military service to his country, alcoholism, emotional problems, and remorse for the crime. The lack

of a substantial criminal record is entitled to relatively significant weight. The remaining factors, such as his military service, are entitled to some weight. Another factor to consider is the prosecutor's "overzealous" application of the aggravating circumstances "to the same act or indivisible course of conduct," which was criticized in *Jenkins*.

We conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

687 N.E.2d at 1373-74 (citations omitted and emphasis added).

The Ohio Supreme Court thus employed the practice of "appellate reweighing" specifically authorized under *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990). Reynolds presents no evidence that the state supreme court considered an unconstitutional or unsubstantiated aggravating circumstance. Nor does he allege that the court failed to consider any mitigating factors for which evidence was presented. We do not find the Ohio Supreme Court's appellate reweighing to have been contrary to, or an unreasonable application of, clearly established federal law, and thus we deny Reynolds's final habeas claim.

III

For all of the reasons stated above, we deny Reynolds's habeas petition, thereby **AFFIRMING** the judgment of the district court.