NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0743n.06

Case No. 13-5605

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 24, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| $72,050.00 IN UNITED STATES | ) | KENTUCKY |
| CURRENCY; ONE FIRST SOUTHERN | ) | |
| NATIONAL BANK CASHIERS CHECK | ) | |
| NO. 062629 IN THE AMOUNT OF | ) | |
| $60,649.64; ONE WHITAKER BANK | ) | |
| CASHIERS CHECK NO. 022175 IN THE | ) | |
| AMOUNT OF $100,000.00, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VERNON SMITH, | ) | |
| | ) | |
| Claimant-Appellant. | ) | |

BEFORE: COOK and GRIFFIN, Circuit Judges; RICE, District Judge[*]

---

[*]The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

COOK, Circuit Judge.  Vernon Smith challenges the district court's grant of summary judgment in favor of the government in this action seeking the forfeiture of two cashier's checks in the aggregate amount of $122,000.  Discerning no error, we affirm.

I.

On August 9, 2007, federal agents seized two cashier's checks from Vernon's home during a search executed as part of a fraud investigation into Target Oil and Gas Corporation ("Target Oil"), a company run by Vernon's sons that engaged in speculative oil drilling.  A grand jury indicted the sons, Michael and Christopher, along with four other Target Oil employees for offenses arising from a fraudulent scheme to induce investment in the drilling business.  The four employees pleaded guilty to conspiracy to commit mail and wire fraud, but Michael and Christopher proceeded to trial.

The trial evidence showed that Target Oil mailed potential investors information packets that often misrepresented past success and exaggerated future potential.  *United States v. Smith*, 749 F.3d 465, 474 (6th Cir. 2014).  The company's "closers" then followed up with more misleading information and pressured clients to invest.  *Id.*  When dissatisfied investors complained, the company offered them additional shares in underperforming wells.  *Id.* at 475.  In the end, "[o]f the millions of dollars invested in the company, only thousands of dollars were returned as royalties."  *Id.* at 474.  The jury convicted Michael of conspiracy and eleven counts of mail fraud, and Christopher of seven counts of mail fraud.  In convicting, the jury found that the cashier's checks seized from Vernon's home constituted proceeds of the crimes.  (R. 31-2, Jury Verdict at 2.)  We affirmed the judgment of the trial court over the parties' claimed errors.  *See Smith*, 749 F.3d 498.

Next came the case we review here, the government's *in rem* civil forfeiture action to seize the two cashier's checks in the amount of $60,649.64 and $100,000. Vernon claimed ownership of the checks, and the government then moved for summary judgment, pointing to evidence that Vernon used investor money from Target Oil to purchase the checks. The district court found that $122,000 of investor money funded the cashier's checks, and because the company's scheme to defraud was "so pervasive[,] . . . any money taken from investors['] funds can be considered the proceeds of a scheme or artifice to defraud." (R. 43, Am. Op. & Order at 16-18.) After rejecting Vernon's innocent-owner defense, the district court ordered a forfeiture of the checks in that partial amount. Vernon appeals.

## II.

We review de novo the district court's grant of summary judgment, *Briscoe v. Fine*, 444 F.3d 478, 485 (6th Cir. 2006), affirming if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

### A. Proceeds

Vernon first argues that the district court "applied the wrong legal standard" in concluding that the $122,000 constituted forfeitable proceeds. Under the civil forfeiture statute, "'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture." 18 U.S.C. § 981(a)(2)(A). According to Vernon, the court should not have treated all of Target Oil's investor funds obtained during the conspiracy as "proceeds" because the government needed to prove that the overt acts of fraud directly generated the funds Vernon claimed.

But the statutory language—defining proceeds to include property obtained "directly or indirectly" from the crime—and our criminal forfeiture cases endorse no such stringent standard. For instance, in Michael and Christopher's appeal, we held that the investor money that funded the purchase of the cashier's checks constituted forfeitable proceeds because "the transactions 'all resulted directly or indirectly from a conspiracy to commit fraud.'" *Smith*, 749 F.3d at 488-89 (citation omitted); *see also United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010) (holding entirety of the business's revenue constituted forfeitable "proceeds that resulted, whether directly or indirectly," from the conspiracy). Notably, *Smith* did not require evidence linking the funds to specific overt acts. 749 F.3d at 488 ("Ample evidence also supports the district court's finding that Target Oil was used as a vehicle to commit fraud. The court concluded that fraud touched everything—from Target Oil's banking accounts to its day-to-day operations—meaning that the various items connected to Target Oil's revenue stream are subject to forfeiture." (internal reference omitted)). Vernon makes no argument that we should interpret the civil forfeiture statute differently than the criminal forfeiture statute, and we see no reason to do so. *Compare* 18 U.S.C. § 981(a)(2)(A) (defining forfeitable proceeds in civil context as "property . . . obtained directly or indirectly, as the result of the . . . the offense"), *with* 18 U.S.C. § 982(a)(2) (providing for criminal forfeiture of the "proceeds the person obtained directly or indirectly, as the result" of the offense).

Vernon argues that his circumstances fall outside of the standard applied by our precedent for two reasons. First, he denies the existence of the conspiracy to defraud. But our previous decision held otherwise. *See Smith*, 749 F.3d at 488. Second, he points to two district court cases defining proceeds as "property that a person would not have but for the criminal

offense," *see, e.g.*, *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012), to argue that the government cannot satisfy this standard because his money flowed from legitimate transactions predating Michael and Christopher's specific fraudulent acts. But this argument ignores the government's authority to seize the proceeds that resulted directly or indirectly from the conspiracy to commit fraud, 18 U.S.C. § 981(a)(1)(C), which began before Vernon obtained the money. *See also Warshak*, 631 F.3d at 332 (finding argument that the government could not seize the proceeds from legitimate transactions without merit because "[a]ny money generated through these potentially legitimate sales . . . resulted 'directly or indirectly' from a conspiracy to commit fraud"). In sum, Vernon fails to highlight any legal error by the district court.

*B. Investor Funds*

Next, Vernon argues that district court erred in tracing $75,000 used to purchase one of the cashier's checks to investor funds, offering a different explanation—unrelated to the fraud— for how the money appeared in his account. But Vernon initially acknowledged in his response to the government's summary-judgment motion that the government conducted an "extensive review" of the relevant bank records and could trace the amount to investor funds. (R. 31-1, Mem. at 3, 5 (requesting the court overrule the government's summary judgment motion as to "portions of the cashier's checks," and acknowledging that $122,000 came from investor funds, necessarily including the $75,000 that bought cashier's check number 0022175).) Indeed, an exhibit that the government attached to its verified complaint reflects this exhaustive review. It details how Target Oil purchased a compressor with investor funds before selling it for $75,000 and depositing that money into its operating account. Then, Michael withdrew $75,000 from that account and purchased a cashier's check in that amount, depositing it in an account held

jointly with Vernon, his father. Vernon, in turn, withdrew that $75,000 to apply it to the purchase of the seized $100,000 cashier's check. (R. 1-5, Bottoms Aff. Ex. B at 1-6.)

Vernon now disparages that exhibit, arguing that it cannot qualify as "legally competent evidence," though he lodges no specific complaints with its detailed transactional history. (Reply Br. at 21-22.) Even if Vernon's earlier concession does not estop him from changing positions on appeal, *see Johnson v. U.S. Postal Serv.*, 64 F.3d 233, 237 (6th Cir. 1995), his evidentiary challenge lacks merit. The government incorporated the exhibit in its complaint that it verified under 28 U.S.C. § 1746, and the verifying postal inspector's affidavit identifies the exhibit as part of the analysis of the cashier's checks performed during the fraud investigation. (R. 1, Verified Compl. ¶ 7; R. 1-2, Verification; R. 1-3, Bottoms Aff. ¶ 50.) The district court therefore properly considered the exhibit. *See Am. Civil Liberties Union of Kentucky v. Grayson Cnty., Ky.*, 591 F.3d 837, 844 n.2 (6th Cir. 2010) ("A verified complaint carries the same weight as would an affidavit for the purposes of summary judgment.") (internal quotation marks omitted).

Vernon's alternative theory for the $75,000 similarly lacks merit. He points to the affidavit of a Target Oil accountant that states the $75,000 came from the legitimate sale of a drill rig, not the compressor purchased with investor funds. (Appellant Br. at 23, 36-38; R. 34-2, Butler Aff. ¶ 6.) But Vernon offers no evidence that his sons or their companies deposited *those* sale proceeds into the Target Oil account (Citizens Bank 2016443) that ultimately funded the seized cashier's check. The accountant has no firsthand knowledge of that; his belief that the deposit occurred stems entirely from his "recollection of a conversation with Mi[chael] Smith in April 2004." (*See* R. 34-2, Butler Aff. ¶ 6.) We cannot credit such conjecture. *See* Fed. R. Civ.

P. 56(c)(4) ("An affidavit . . . must be made on personal knowledge."). And though Vernon offered a bank statement, check, and deposit slip showing that the Target Oil account posted a $75,000 deposit and withdrawal on the same day, that aligns with the government's tracing of funds to support its theory that the compressor funded the cashier's check. (*See* R. 34-2, Butler Aff. Attached Docs.) Thus, we find no error in the district court's conclusion that Vernon failed to present evidence creating a genuine issue of material fact about the source of the $75,000 used to purchase the seized cashier's check.

*C. Evidentiary Hearing*

Vernon also contends that the district court needed to conduct an evidentiary hearing on his motion to correct the judgment because, according to Vernon, the government never carried its initial summary-judgment burden of tracing the investor money to "specific acts of mail fraud." We review this claim for an abuse of discretion. *Reynolds v. Bagley*, 498 F.3d 549, 552 (6th Cir. 2007). Having discerned no error in the district court's application of our legal standard to determine what money qualified as forfeitable proceeds, we find that the district court acted within its discretion.

*D. Innocent Owner*

After the government established that the cashier's checks were subject to forfeiture, the burden shifted to Vernon to demonstrate that he qualified as an "innocent owner" of the seized property. Vernon maintains that the district court erred in determining that he could not satisfy the innocent owner defense under 18 U.S.C. § 983(d)(2)(A). That provision applies to "property interest[s] in existence at the time the illegal conduct giving rise to the forfeiture took place."

Vernon claims that he had a pre-existing interest in the money, deposited by Michael, that he used to purchase the seized cashier's checks, because he loaned Michael "in excess of $150,000 around 1980 so that [his son] could set up a sawmill business." (R. 34-1, Smith Aff. ¶ 5.) Accepting this vague account of a 30-year-old business loan for the sake of argument, § 983(d)(2)(A) provides no protection for such an unsecured loan. *See* 18 U.S.C. § 983(d)(6)(B)(i) (stating that the term "owner" excludes "person[s] with only a general unsecured interest in, or claim against, the property or estate of another"). Accordingly, Vernon's protectable ownership interest in the funds used to purchase the seized cashier's checks arose when Michael deposited them into their joint account between May 2003 and April 2004— *i.e.*, when Vernon could exercise dominion over the funds. Because these deposits occurred after the start of his sons' conspiracy in February 2003, *see Smith*, 749 F.3d at 488-89, the district court properly deemed § 983(d)(2)(A) inapplicable.

III.

We AFFIRM.

**RICE, District Judge, dissenting**. I respectfully dissent. In my view, genuine issues of material fact preclude summary judgment on the question of whether the investor funds used to purchase the cashier's checks are, in fact, traceable to the conspiracy to defraud, and on the question of whether Claimant Vernon Smith can establish the "innocent owner" defense. I would therefore vacate the district judge's orders and remand the case for an evidentiary hearing.

The government bears the burden of proving, by a preponderance of the evidence, that the property at issue is subject to forfeiture. *See* 18 U.S.C. § 983(c). Here, the cashier's checks at issue are subject to forfeiture only to the extent that the investor funds used to purchase them are traceable to the conspiracy to commit mail fraud. All property obtained directly or indirectly as a result of the "scheme or artifice to defraud" is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(E).

It appears to be undisputed that the investor funds that were ultimately used to purchase the $60,649.64 cashier's check were received by Target Oil and Gas ("Target") and deposited in the First Southern National Bank account between May and July of 2003. Likewise, it is undisputed that the $75,000 used to purchase the $100,000 cashier's check was deposited in the Whitaker Bank account on April 9, 2004. The district court found that this $75,000 deposit was traceable to Target's sale of an IR compressor, originally purchased by Target in late 2003 with investor funds.[1]

Assuming *arguendo* that all of the investor funds used to purchase the two cashier's checks were received by Target in 2003, the key question is whether these funds were obtained as a result of the "scheme or artifice to defraud." As the district court correctly noted, the funds

---

[1] Vernon Smith maintains that the $75,000 deposit instead resulted from the sale of a drill rig by Kentucky-Indiana Oil & Gas and involved no tainted investor funds.

were received from Target investors during the time period of the conspiracy as alleged in the criminal indictment, "[f]rom on or about February 18, 2003, and continuing through on or about February 2008." However, in my view, under the unique circumstances of this case, that fact is not dispositive.

In order to obtain a conspiracy conviction, the government need not prove the exact temporal boundaries of the conspiracy. *See United States v. Willis*, 232 F. App'x 527, 538 (6th Cir. 2007) ("the exact date of the conspiracy is not an element of the crime."); *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989) ("When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established."). Therefore, the dates alleged in the indictment are not dispositive concerning the temporal scope of the conspiracy.

Here, the indictment alleges that the conspiracy began "on or about February 18, 2003." Yet, the first overt act alleged did not occur until March 24, 2004, when Target mailed a packet of materials to an investor. The indictment itself alleges no specific acts of wrongdoing between February 18, 2003, and March 24, 2004.[2] This is the *crucial* time period during which all of the investor funds used to purchase the cashier's checks were received by Target.

In *United States v. Rogers*, Case No. 12-2594, 2014 WL 4400784, at *7 (6th Cir. Sept. 8, 2014), recently re-designated as a published opinion, the court held that a mail fraud conspiracy conviction under 18 U.S.C. § 1349 does not require proof of an overt act. This, however, does

---

[2] In fact, the year 2003 is mentioned just one other time in the indictment. Paragraph 11 alleges that: "As part of the conspiracy, the Defendants intentionally failed to disclose to potential investors numerous material facts, including, but not limited to: . . . that the Kentucky Department of Financial Institutions entered into an Agreed Order with Target Oil and Defendant Michael Smith on February 14, 2003," concerning the accreditation of potential investors and the provision of offering circulars. Although the Agreed Order was allegedly signed in February of 2003, it is not clear when the alleged intentional concealment took place.

not change the fact that the cashier's checks at issue in this case are not subject to civil forfeiture unless the Government proves that the investor funds used to purchase them were obtained as a result of the fraudulent scheme. *See* 18 U.S.C. § 981(a)(1)(E). This necessarily requires a determination of when the fraudulent scheme began. The district court points to no evidence in the record to support a finding that the conspiratorial agreement was already in existence in 2003 when Target received the investor funds at issue. Absent such a finding, it cannot be said that the funds were obtained as a result of the alleged conspiracy to defraud. In my view, the district court erred in determining, as a matter of law, that the Government satisfied its burden of proving that the cashier's checks were subject to forfeiture. An evidentiary hearing is needed to determine when the conspiracy came into being.

In reliance on *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the district court found that the scheme to defraud investors was "so pervasive" that "any money taken from investors [sic] funds can be considered the proceeds of a scheme or artifice to defraud." The majority's endorsement of this same view is, in my opinion, flawed.

Vernon Smith maintains that all investor funds deposited to Target's accounts in 2003 were derived from legitimate investor transactions that pre-dated any wrongdoing, and that the court's "pervasive fraud" approach, as applied in this case, contravenes the statutory requirement that only those proceeds traceable to the conspiracy to defraud are subject to forfeiture. I agree.

*Warshak* is factually distinguishable. In that case, defendants sold herbal supplements that purportedly enhanced male sexual performance. From its inception, the product was bogus. The doctors who purportedly developed the supplement were entirely fictitious, and the advertisements touted fictitious consumer satisfaction studies. Defendants were convicted of fraud and ordered to forfeit $459 million in proceeds, the entirety of their company's revenue.

Defendants appealed that decision, arguing that, although there was evidence of fraud early on, they thereafter ran a legitimate business. They argued that the portion of revenue earned after 2003 was not subject to forfeiture. The court disagreed, concluding that the fraudulent scheme was so pervasive that all revenue was subject to forfeiture. The court found that, even though the company "attempted to affect an air of legitimacy, the very nucleus of its business model remained rotten and malignant," and the "entire operation was permeated with fraud." *Id.* at 332. The court rejected the argument that the later sales were legitimate, concluding that all sales were the outgrowth of the company's fraudulent beginnings. *Id.*

In contrast to *Warshak*, Target's beginnings were apparently legitimate. Notably, of the more than $15 million in investor funds received by Target, the government alleged that only $3.2 million was fraudulently obtained. Moreover, of Target's more than 150 well projects, only seventeen of those projects were the subject of the indictment. This implies that a significant portion of Target's business transactions were not tainted by fraud. The court's "pervasive fraud" approach, as applied to the facts of this particular case, can lead to a result that is contrary to law, given that unless the funds at issue are traceable to the conspiracy, they are not subject to forfeiture.

Vernon Smith notes that the jury acquitted the defendants on many of the counts of mail fraud, and the jury found fraud in connection with just eight well projects. None of the investor funds that were used to purchase the cashier's checks were traceable to those eight projects. Smith argues that, in determining which funds were subject to forfeiture, the district court should have focused its inquiry solely on those well projects for which defendants were charged and convicted. This argument lacks merit. Because Michael Smith was convicted of conspiracy, the court may also consider uncharged and acquitted conduct that falls "within the boundaries of the

overall scheme." *United States v. Capoccia*, 503 F.3d 103, 117 (2d Cir. 2007) (quoting *United States v. Boesen*, 473 F. Supp. 2d 932, 952 (S.D. Iowa 2007)). *See also United States v. Yass*, 636 F. Supp. 2d 1177, 1185 (D. Kan. 2009) ("Courts have ordered forfeiture of property derived from uncharged and acquitted conduct that is part of the same scheme or enterprise as convicted conduct, relying on the breadth of the conduct forming the basis of the offense of conviction."); *United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009) (noting that the civil forfeiture statute "contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction.").

Nevertheless, one cannot determine which property is subject to forfeiture without first identifying the "boundaries of the overall scheme." In this case, for the reasons set forth above, the temporal boundaries of that scheme have not been sufficiently defined. The government must prove, by a preponderance of the evidence, that the conspiracy to defraud was in existence when the investor funds at issue were acquired by Target. If those funds were acquired *before* the conspiracy was formed, they cannot logically be deemed "proceeds" of the conspiracy, and would not be subject to forfeiture. For this reason, an evidentiary hearing is required.

The question of when the conspiracy to defraud began is also crucial to determining whether Vernon Smith can establish that he is an "innocent owner" of at least some of the funds at issue. An innocent owner's interest in property is not subject to forfeiture. 18 U.S.C. § 983(d)(1). The relevant statutory provision reads as follows:

> With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who–
> (i) did not know of the conduct giving rise to forfeiture; or
> (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

- 13 -

18 U.S.C. § 983(d)(2)(A). In this case, Vernon Smith knew nothing of the conduct giving rise to the forfeiture of the cashier's checks. The key issue is whether Vernon Smith's property interest in those cashier's checks arose before or after the illegal conduct at issue took place.

Vernon argues that Michael gave him the money to repay a loan made more than thirty years earlier. Assuming *arguendo* that this is true, it was an unsecured loan. As such, Vernon had no protectable property interest in the outstanding debt. *See* 18 U.S.C. § 983(d)(6)(B)(i) (providing that the term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another"). Vernon's property interest in the money did not arise until Michael gave it back to him and he exercised control over it. With respect to the money used to purchase the first cashier's check, it appears that Michael gave Vernon these funds between May of 2003 and August of 2004. The second cashier's check was purchased with funds given to Vernon by Michael on April 9, 2004.

Again, although these dates fall within the temporal scope of the conspiracy, as alleged in the indictment, it is not clear when the conspiracy was actually formed. Until the date that "the illegal conduct giving rise to forfeiture" is determined, it is impossible to decide whether the "innocent owner" defense, as set forth in § 983(d)(2)(A), is applicable. At the very least, there is a possibility that Vernon Smith could be deemed the "innocent owner" of some portion of the funds that Michael gave him in 2003.

For these reasons, I believe that the district court erred in granting the government's motion for summary judgment and in denying Vernon Smith's request for an evidentiary hearing. I would therefore vacate the district court orders and remand the case for further proceedings.