CINCINNATI BAR ASSOCIATION *v.* STIDHAM.

[Cite as *Cincinnati Bar Assn. v. Stidham* (2000), 87 Ohio St.3d 455.]

(No. 99–1156—Submitted September 15, 1999—Decided January 5, 2000.)

456

458

460

---

Sandra P. Kaltman and David T. Croall, for relator.

H. Fred Hoefle, for respondent.

ALICE ROBIE RESNICK, J.  We adopt the findings of fact and conclusions of law of the board, but not its recommendation.  Respondent principally takes issue with two aspects of the board's report, and so objects to the board's findings of fact, conclusions of law, and recommended sanction.  Respondent's major points of contention involve (1) some of the board's findings of fact and conclusions of law in the Adkins matter, particularly the board's conclusion that he violated DR 1–102(A)(4) by engaging in willful deceit, and (2) his position that the board failed to take all mitigating factors into account, particularly the effects of his depression, in recommending an indefinite suspension as a sanction.

Issues relating to respondent's depression color our consideration of both of his major points of contention.

In disciplinary cases, the relator must prove that the respondent committed the alleged violations by clear and convincing evidence.  See Gov.Bar R. V(6)(J); *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus.  Respondent argues that relator did not fully meet its standard of proof.

With regard to the board's conclusion that respondent violated DR 1–102(A)(4) in the Adkins matter, we accept the findings of fact and also this accompanying conclusion of law, but with a caveat.  When respondent's depression is taken into account, respondent's assertions that he ignored all the warning signs that would have alerted a reasonable attorney that something was seriously wrong in his handling of the escrow account do seem somewhat credible.

Respondent testified that he simply tossed all of his bank statements aside without opening them since sometime in 1996, so that he was totally unaware of the huge problems that had arisen in his handling of the money at issue.  Respondent further testified that he had an understanding with Valley Central Savings Bank that if one of his several different accounts there ran short of funds, bank employees would call him and get his authorization to shift the money around to the fund that needed it.  Respondent testified that he routinely gave the approval without realizing that it often was the IOLTA account that was being depleted to raise the balances in other accounts.  Respondent stated that he made deposits of more than $43,000 into the IOLTA account from sources other than Adkins, and further stated that his safe at all times contained enough cash to cover Adkins's escrow amount.  Therefore, respondent claims, Adkins, who was never his client, was never in any danger of losing the money.

However, after thoroughly reviewing the entire record, we can appreciate how the panel members could have become convinced that respondent's testimony that he ignored all the warning signs in the Adkins matter was lacking in credibility.  The severity of the problems in the Adkins matter accelerated to a

point that, even if one accepts at face value respondent's testimony that he committed no intentional misconduct but was merely negligent, the degree of obliviousness to the problems became exacerbated so that it could be viewed as the equivalent of intentional deceit. In addition, when Adkins inquired about the funds in the account, respondent told her, "I assure you that there is nothing untoward * * * happening with these funds," apparently without even checking into the matter at that time to verify the truth of what he was stating. Considering that the board's finding of a violation of DR 1–102(A)(4) in this situation was effectively a mixed determination of fact and law, and that the panel had an opportunity to evaluate the credibility and demeanor of the witness through his actual testimony, we will not second-guess the panel's and board's determinations.

Nevertheless, we are impressed that respondent's battle with the debilitating effects of his depression is genuine, and recognize that the possibility remains that respondent actually was subjectively unaware of the numerous warning signs all around him that normally would have indicated problems with the IOLTA account. Respondent acknowledged at the hearing that when everything came to light, he knew that he had "totally screwed it up" in handling the funds. Due to his depression, respondent was not functioning as a reasonable attorney in his approach to this entire matter, but at times was paralyzed into inaction by his depression. When, however, he did become aware of the magnitude of the problems, he took immediate steps to correct them.

In sum, although we do not second-guess the board's finding of a violation of DR 1–102(A)(4) in the Adkins matter, the circumstances surrounding that violation affect our evaluation of what sanction is appropriate.[1]

Respondent contends that the board, in recommending an indefinite suspension, did not give enough weight to all the mitigating factors present, including

---

1. We note at this point that, although the board also found that respondent was not totally truthful and candid in the Caldwell matter, the record appears to support respondent's contentions that once he realized that he had earlier had a mistaken impression regarding the events in that episode, he recanted his previous resistance to Caldwell's claims against him, admitted his mistake, and settled the claims for more than they may have been worth. Since respondent stipulated to all four violations charged in that matter, and since the board adopted the stipulated facts as its findings of fact without adding any further findings, respondent does not directly challenge the findings of fact and conclusions of law with respect to the Caldwell matter, but takes issue with the board's comment that he was less than truthful.

   In addition, we also recognize that the board's finding that respondent attempted to mislead relator in the investigation of the Adkins matter is similarly based on the board's interpretation of events that could have been viewed differently. In the same way that we accept the board's findings of fact and conclusions of law in the Adkins matter, we do not separately address or specifically agree with respondent's contention that the board misinterpreted the record in reaching the conclusion that respondent intended to mislead relator.

his depression. We agree that there are significant mitigating factors. Respondent was cooperative with relator, allowing the parties to achieve extensive stipulations of fact in the matters at issue. Respondent also stipulated to most of the violations charged by relator. Respondent had an exemplary record in the military service of this country. Many letters attesting to respondent's character and standing in the legal community were supplied to the board by respondent from judges and lawyers who had come into contact with respondent in his practice of law. Respondent has no prior disciplinary history. Respondent shows remorse for what he has done, takes responsibility for his actions, and has changed his office and accounting practices to prevent future problems. Respondent has suffered from many physical ailments during the time of the events at issue.

In addition, as stated above, we are convinced that respondent's depression had a severe and debilitating effect on his ability to function as an attorney. The depression manifested itself most directly in the Adkins matter, but also appears to have played a role in some of the other matters, notably the Feltner matter and the Caldwell matter. The stipulations of fact, particularly in the Adkins matter, support respondent's position on the severity of the depression.

Respondent's treating psychiatrist, J. Stephen Meredith, M.D., provided testimony and a letter detailing respondent's condition that was entered into evidence by respondent at the disciplinary hearing. Dr. Meredith diagnosed respondent with dysthemia and major depression—recurrent. Dr. Meredith explained that respondent in his depression has experienced feelings of guilt, loss of energy, distraction, preoccupation, anxiety, feelings of worthlessness, crying spells, suicidal thoughts, social withdrawal, and sleep impairment. Dr. Meredith stated that depression can impair the ability to follow up or to do needed things, and that one who suffers from depression sometimes is unable to do what to observers appear to be very simple tasks. Dr. Meredith also testified that respondent often did not feel able to take care of details, so that respondent would allow routine matters to go unattended, and that problems would worsen while respondent put off dealing with them.

Dr. Meredith stated that he believed that respondent is fit to practice law, and that there had been recent improvements in respondent's condition. He also stated that respondent needs continuing treatment, and that respondent's prognosis for recovery is good.

Respondent testified at the hearing about his struggle with depression, detailing his inability to get any quality sleep, and graphically describing his feelings of hopelessness and worthlessness, as well as his despair, exhaustion, and anxiety. Respondent stated that he is now "dealing with it," in part due to recent successes with medications. He explained that he still has depression symptoms,

including problems sleeping, but that he feels that his recent treatment causes him to be optimistic.

At the same time that we acknowledge the severity of respondent's depression, we cannot overlook the way that depression manifested itself in the multiple disciplinary violations respondent has committed. Even though it does not appear that anyone was seriously hurt by respondent's ethical violations, his fitness to practice law has been called into question.

In balancing all the considerations, we conclude that a two-year suspension, with the second year of the suspension stayed, is the appropriate sanction. In addition, respondent must submit to a monitoring program established by relator, including the terms we detail below, and must satisfy the conditions we impose as a prerequisite to resuming the practice of law.

Even though Dr. Meredith stated that respondent was making progress with his treatment, Dr. Meredith also expressed an opinion that respondent's recovery might have progressed more rapidly in the past if respondent had scheduled more treatment visits, and if respondent had devoted more time to his treatment. As a part of the monitoring obligations we impose, we require relator, respondent, and respondent's treating therapist (presumably Dr. Meredith) to agree upon a treatment schedule that requires respondent to undergo more consistent treatment than he has in the past. In addition, we impose the further requirement that respondent's treating therapist submit reports to relator, on a schedule established by relator, concerning the course of treatment.

As a prerequisite to respondent's resumption of the practice of law at the end of the first year of the suspension, we require respondent to comply with the monitoring conditions, and we require respondent to submit evidence to the court establishing that he is at that time managing the depression and is capable of returning to the practice of law. If these requirements are fulfilled, and respondent returns to the practice of law, we require the monitoring to continue during the second year of respondent's suspension. Costs taxed to respondent.

*Judgment accordingly.*

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., dissent.

----

COOK, **J.,** dissenting. I agree with the majority's decision to adopt the findings and conclusions of the board, but I respectfully dissent from the majority's decision to impose a more lenient sanction than the board recommended. I do not believe that the majority should have assigned weight to respondent's

depression as a mitigating circumstance in regard to the disciplinary violations that respondent committed in the Adkins matter. Depression symptoms of inattention or unawareness should not bear any mitigating weight in the application of the appropriate sanction in light of the explicit deceit and threats contained in respondent's letter to Adkins.

The ABA Standards for Imposing Lawyer Sanctions provide that before aggravating or mitigating circumstances are considered, *disbarment* is appropriate for disciplinary violations of the character that respondent committed in the Adkins matter. See ABA Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions (1991 and Amend.1992), Standard 5.1. Under the ABA Standards, "[d]isbarment is generally appropriate when * * * a lawyer engages in * * * intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." Standard 5.1.

After failing to open an escrow account on behalf of Adkins as he had agreed to do, and after mishandling the funds that were to be escrowed, respondent answered Adkins's inquiry (about the location and status of the funds) with a misleading and threatening letter. For these acts, the panel and board determined that respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of DR 1–102(A)(4). A lawyer who engages in deceitful or dishonest conduct "has violated one of the most basic professional obligations to the public, the pledge to maintain personal honesty and integrity." Standard 5.1, Commentary.

My initial determination of disbarment as the appropriate sanction would give way to the board's lesser recommended sanction—indefinite suspension—due to the presence of several mitigating factors in this case. Respondent's military service in Vietnam and his honorable discharge from the armed services attest to his positive character and reputation. His cooperative attitude toward the disciplinary proceedings, lack of prior disciplinary record, and effort to modify his questionable office practices are additional mitigating factors recognized in both the ABA Standards and the Board of Commissioners' Proposed Guidelines for Imposing Lawyer Sanctions. Cf. ABA Standards, *supra,* Standard 9.32; Board of Commissioners on Grievances and Discipline, Proposed Rules and Regulations Governing Procedure on Complaints and Hearings, Section 10, Guidelines for Imposing Lawyer Sanctions, 87 Ohio St.3d xliv-xlvi.

I would, therefore, accept the board recommendation to indefinitely suspend respondent rather than disbar him. The majority's decision to credit additional mitigation centers on its willingness to accept respondent's depression as an explanation for respondent's behavior in the Adkins matter. The majority concludes that due to respondent's depression, "the possibility remains that

respondent actually was *subjectively unaware* of the numerous warning signs all around him that normally would have indicated problems with the IOLTA account." (Emphasis added.)

The tone and language of respondent's letter, however, belie the majority's assertion that the respondent could have been "subjectively unaware" of what was happening. Respondent *explicitly assured* Adkins that there was nothing "untoward" or "out of the ordinary" happening with the funds, and *explicitly threatened* Adkins with a "nightmare" if respondent felt that Adkins was impugning his name or reputation.

I do not suggest that clinical depression may never constitute a mitigating factor under appropriate circumstances. And like the majority I believe that respondent's battle with depression is genuine. However, due to the tone and content of the Adkins letter, I do not believe that respondent was "paralyzed into inaction" or was "subjectively unaware" of what was happening when he committed the disciplinary violations in the Adkins matter.

For these reasons, I would have accepted the board's recommendation to indefinitely suspend respondent.

MOYER, C.J., and PFEIFER, J., concur in the foregoing dissenting opinion.